Charles Frank RED, Appellant,

v.

GROUP MEDICAL AND SURGICAL SERVICE, Appellee.

No. 13073.

Court of Civil Appeals of Texas.

Galveston.

Feb. 7, 1957.

Billy E. Lee, Houston, for appellant.

Townes & Townes and Edgar E. Townes, Jr., Houston, for appellee.

GANNON, Justice.

Suit by Charles Frank Red against Group Medical and Surgical Service, a Texas insurance corporation, on a Catastrophic Illness Endorsement issued plaintiff in connection with his Blue Shield Membership Agreement. The endorsement insured plaintiff and his dependents, including his minor son, Charles Randall Red.

While the Catastrophic Illness Endorsement was in force and effect, and on or about the 6th day of March, 1953, plaintiff's infant son, Charles Randall Red, fell victim to spinal meningitis. At the time plaintiff and his son were residing at Odessa, Texas. The child was treated by Dr. Jakie Hunt of that place. In April of 1953 the boy was referred by Dr. Hunt to Dr. Joseph A. Stool of Houston, Texas, who since that time and up to the termination of the illness has functioned as the boy's attending physician.

It is conceded that prior to the times material to this controversy Charles Ran-

dall Red had, except for certain sequelae, fully recovered from the disease of spinal meningitis. However, as a result of it he was left with neuro-deafness—practically total except for some possible slight but ineffective function of the nerve to the left ear. This type of deafness cannot be corrected or even materially improved by hearing aids when, as here, the nerve itself in respect to the right ear is totally destroyed and so seriously damaged in respect to the left ear as to amount to practically the same thing. When a person after recovering from a disease such as spinal meningitis is left with neuro-deafness, he can be taught to and enabled to communicate with others either by the use of hand sign language or by lip-reading. According to some of the testimony, hand sign language is now considered barbaric and for persons in plaintiff's son's condition education in lip-reading is thought more desirable.

In this case, after the disease had run its course and upon the recommendation of Dr. Stool—the attending physician—plaintiff's infant son was entered as a pupil at the Houston School for Deaf Children and this suit is to recover on the Catastrophic Illness Endorsement above referred to, the attendance and tuition fees charged by the school for the educational process of teaching its students lip-reading, and as well for the expense of certain private tutoring services along the same line.

The Catastrophic Illness Endorsement in its entirety follows:

"Group Medical and Surgical Service
Dallas, Texas

has, upon proper application and in consideration of the additional rate of dues shown below, issued to the Member named below, this

Catastrophic Illness Endorsement

to his or her Blue Shield Membership Agreement,

Name
Charles Frank Red

| Group No. | Certificate No. | Endorsement Eff. Date |
|---|---|---|
| 13156 | 653650 | 6–15–52 |

Monthly Rates

Individual: 12 c      Member and all Dependents: 24 c

Each Sponsored Dependent: 12 c

entitling the member and each of his or her Dependents and Sponsored Dependents presently included under the Membership or added hereafter by supplemental application, to the benefits set forth below, subject to the conditions recited in this Endorsement, and in the Blue Shield Membership Agreement. This Endorsement becomes a part of the Blue Shield Membership Agreement, and all its provisions not in conflict herewith apply with equal force to this Endorsement.

I. Illnesses Included

When, on or after the effective date shown above, any person included hereunder shall contract one of the following diseases:

Poliomyelitis  Cerebro-Spinal Meningitis
Leukemia          (Meningococcus)
Diphtheria    Encephalitis
Scarlet Fever      (Sleeping Sickness)
Smallpox      Tularemia
Tetanus       Rabies

"the benefits listed in this Endorsement shall be available for the care of the patient, in lieu of and in substitution for those which might otherwise be available under the listings of benefits in the Blue Shield Membership Agreement.

II. Maximum Period and Amount

For each person included hereunder, the benefits shall be available for expenses incurred during the two-year period immediately following diagnosis of any of the named diseases, and not thereafter.

In no event shall the maximum liability of the Plan under this Endorsement exceed

$1,500.00 for any one illness, or during any two-year period.

### III.  Benefits

Subject to all the conditions herein contained, the Plan will pay for the following items of expense incurred in the treatment and care of the patient, provided such charges are necessary, customary and reasonable and the services are rendered by or at the direction of the attending physician.

A.  The Professional Fees of the attending physician and consulting physicians and specialists to whom the patient may be referred.

B.  The Professional Fees of anesthesiologists not employed by the hospital.

C.  Special Nursing Services: Attendance at the patient's home by not more than three Registered Nurses per day, and on the basis of the usual charge (relatives or members of the patient's family excluded).

D.  Drugs and Medicines: All expense incurred for medicines used in the treatment of the disease, outside the hospital.

E.  Transportation: The fare for conveyance of the patient and one attendant by ambulance, rail, air or other public carrier to any hospital when the attending physician considers such a trip and mode of travel necessary to the proper treatment of the disease.

F.  Orthopedic Appliances: The cost of braces, crutches, and one manually-operated wheelchair, as prescribed.

G.  Physiotherapy: All charges for such services rendered by physicians or physiotherapists who are members of or eligible for membership in the American Physical Therapy Association.

H.  X-Ray: All charges for such services required for diagnosis and treatment, and rendered by physicians.

Group Medical and Surgical Service
Dallas, Texas
/s/ E. H. Cary
President
/s/ Lawrence Payne
Secretary
/s/ W. R. McBee
Executive Director"

It will be noted that the endorsement covers the illness—Cerebro-Spinal Meningitis—contracted by plaintiff's son, and the question before us is whether the tuition fees paid the Houston School for the Deaf and the tutoring fees paid for private tutoring in lip-reading constitute expenses "incurred in the treatment and care of the patient," as provided in the contract, in the nature of any of the following: "The professional fees of the attending physician and consulting physicians and *specialists* to whom the patient may be referred." (Emphasis supplied)

It is plaintiff's contention that the expenses incurred by him for the education of his son in lip-reading fall within subdivision A. of the benefits provided and constitute, within the meaning of the insuring clause, professional fees of specialists to whom the patient was referred by the attending physician. The defendant denies that the expenses sued for are within the coverage of the policy. The trial court so ruled, and hence this appeal.

■  We are convinced the judgment of the trial court must be affirmed since we are of the opinion that the expenses sued for were not incurred "in the treatment and care" of plaintiff's son as a "patient." We do not think that the educational, schooling, or training fees paid by plaintiff for teaching his son the new skill of lip-reading fall within the insuring clause of the contract in that even though they be classed as professional fees of specialists, the policy still does not contemplate fees of other than medical or surgical specialists—certainly not those of educational instructors of any class.

When the Catastrophic Illness Endorsement is viewed from its four corners and in arriving at the intent of the parties in entering into the contract, effect is given to all of its provisions, we are impressed that the only expenses which the "Plan" undertakes to pay are expenses incurred *in the treatment and care of a patient.* Expenses incurred for education in lip-reading cannot, in our opinion, in any reasonable view be said to be incurred in the treatment and care of a patient.

The following definitions taken from Webster's International Dictionary have been helpful to us. These definitions properly define the terms: *care, patient, treat,* and *treatment* as used in the policy, according to the common understanding and meaning of the terms, in the context there found:

*Care:* charge, oversight, or management. *Implying responsibility for safety;* as, under a doctor's care.

*Patient:* a sick person, now commonly, one under treatment or care as by a physician or surgeon, or in a hospital; hence, a client of a physician, hospital, or the like.

*Treat:* to care for (a patient) medically or surgically; as, to treat one for rheumatism or with x-rays; also to seek cure or relief of a disease, etc.; as, to treat a bruise with hot applications.

*Treatment:* act, manner, or an instance of treating, esp. of treating a person or animal, a patient, subject, or a substance, as in processing; handling; usage; as, unkind treatment of a child; to require medical treatment.

It appears from the testimony that the defendant has paid all charges stemming from the illness of plaintiff's son, with the exception of the tuition fees and tutor's fees in question; or, as the plaintiff himself put it, the company just hasn't paid for "this expense of the schooling." The Houston School for the Deaf does not employ physicians or surgeons but only specially trained lay instructors. The school does not undertake to give any medical treatment or care, but is strictly a school where the pupil learns to read lips; or, as plaintiff put it, "It is strictly an educational matter." The schooling was resorted to only after the attending physician told the child's father "that from the standpoint of his treatment as a doctor, from the standpoint of medical treatment and care, that he had done everything that can be done"; or, differently stated, "It's implied, when you say complete nerve deafness, that the only thing to do is to *rehabilitate* them through the means that they [the school] have." (Emphasis supplied) The doctor testified that on his examination and diagnosis he found the hearing nerves completely destroyed and that there was nothing he could do from a medical standpoint to cure the nerve condition and restore the hearing. He explained that the child had a residual deafness "residual from meningitis" and that from a medical standpoint there is no type of "treatment or care which can be given."

When it is considered that the benefits of the policy are carefully limited to definite "items of expense" and to such items as are "incurred in the treatment and care of (the insured as) the patient" and that the items of expense enumerated are each and all of a class ordinarily understood as items necessary, customary and reasonable in the care and treatment of a patient—a sick or injured person—we think we would be going far beyond the intent of the parties as manifested by the contract were we to hold that fees paid to a "school" or tutor for instruction in lip-reading and to acquire a new skill as a substitute for hearing are items of expense incurred in the treatment and care of a patient by way of professional fees of "specialists" within the meaning of the writing, however broadly construed.

■ We are not unaware of the rule which requires, in the event of ambiguity, that insurance contracts be construed strictly in favor of the insured and against

the insurer. However, here we find no ambiguity in the language of the policy when applied to the facts presented, since, as plaintiff testified, the items of expense in dispute were not paid to specialists for the treatment and care of a patient, but were strictly fees paid for schooling and educational instruction.

Affirmed.