Argued July 17, affirmed November 25, 1970, petition for
rehearing denied February 10, 1971

DUNGAN, *Respondent, v.* TRAVELERS
INSURANCE COMPANY, *Appellant.*

476 P2d 915
480 P2d 418

*Edwin J. Peterson*, Portland, argued the cause for appellant. With him on the briefs were Tooze, Powers, Kerr, Tooze & Peterson, and Rees C. Johnson, Portland.

*Nels Peterson*, Portland, argued the cause for respondent. With him on the brief were Peterson, Chaivoe & Peterson, Portland.

Before O'CONNELL, Chief Justice, and SLOAN,* HOLMAN and HOWELL, Justices.

HOWELL, J.

Plaintiff brought this action to recover benefits under a group medical insurance policy which insured employees and eligible dependents of employees of Pacific Northwest Bell Telephone Company. Plaintiff sought to recover charges incurred by him as a result of his son's institutionalization at Fairview Hospital and Training Center in Salem. At the close of the trial both parties moved for a directed verdict. The court, however, submitted the case to the jury and a verdict

---

* Sloan, J., resigned September 30, 1970.

was returned in plaintiff's favor. The defendant appeals from the judgment in plaintiff's favor.

Plaintiff's son, Daniel, who was born in 1945, began to show manifestations of diabetes mellitus at age 15. Between 1961 and 1965 Daniel was admitted to Good Samaritan Hospital in Portland on many occasions for emergency treatment for a diabetic coma or for insulin reaction. In November, 1965, Daniel suffered another severe attack. His arrival at the hospital was delayed when the ambulance broke down. He was unconscious in the hospital for 27 hours with a very high temperature and consequently suffered severe brain damage. Later, he was admitted to Dammasch State Hospital for approximately six months. He returned home for several months on a trial visit and in 1967 was admitted to Holladay Park Hospital. Subsequently he was again transferred to Dammasch and then to Fairview. At the time of his admission to Fairview his mentality was reduced to that of a 5-year-old child, due to the brain damage. His condition was described as moderate to severe mental retardation complicated by diabetes mellitus.

For its first assignment of error, the defendant contends the trial court erred in denying its motion for a directed verdict. The defendant argues that plaintiff failed to prove certain policy requirements: that Fairview was a "hospital" within the terms of the policy; that any of the charges incurred were for "medical services * * * for treatment of injury or sickness"; that Fairview was a "legally constituted hospital"; and that Daniel was an "eligible dependent" under the policy.

■ Defendant's argument that plaintiff failed to prove Daniel was an eligible dependent under the

policy is without merit. The policy defined an eligible dependent as one who is dependent on his father for support and whose total income does not exceed $1200 per year including Social Security benefits. The defendant contends since Daniel was employed prior to his brain damage he was probably covered by Social Security, which could have paid Daniel in excess of $1200 per year. The defendant has overlooked a document signed by plaintiff at the time Daniel was admitted to Fairview. In addition to other general information, the document states that Daniel has no income from Social Security, the Veterans Administration, the State Industrial Accident Commission, the Railroad Retirement Board; owns no real estate; and has no trust fund. There is a blank space on the form following the question dealing with income from other sources, which reasonably indicates Daniel has no other income. The information on this form and the evidence in general concerning Daniel's age and physical and mental condition clearly established that he qualified as an eligible dependent of his father under the terms of the policy.

■ The policy provides for the payment of covered medical expenses, including room and board, "in a legally constituted hospital." The policy defines a "hospital" as follows:

" 'Hospital' means only an institution which meets fully every one of the following tests, namely,

(a) it is primarily engaged in providing—for compensation from its patients and on an inpatient basis—diagnostic and therapeutic facilities for the surgical and medical diagnosis, treatment, and care of injured and sick persons by or under the supervision of a staff of physicians, and

(b) it continuously provides twenty-four hour-

a-day nursing service by registered graduate nurses, and

(c) it is not, other than incidentally, a place for rest, a place for the aged, a place for drug addicts, a place for alcoholics, a nursing home, a hotel or the like.

However, general hospitals operated by the Armed Forces or the Public Health Service of the United States Government will be deemed to be hospitals for the purposes of this Policy."

The facts regarding Fairview Hospital and Training Center, the medical hospital located at Fairview, and Daniel's physical and mental condition plus the treatment he is receiving at Fairview are undisputed.

Fairview Hospital and Training Center is a state-owned institution "for the care and training of such mentally deficient persons as are assigned to its care by the Mental Health Division or who have previously been committed to its custody." ORS 427.010. While mental retardation is the primary criterion for admission to Fairview, it is generally necessary that the person have other complicating physical maladies, such as diabetes, cerebral palsy, or emotional or psychological complications. The institution occupies 640 acres of land with several dozen buildings, including living facilities, a school building complex, and a physical rehabilitation center. Fairview also has a 48-bed hospital including a surgery room, an emergency room, and X-ray and laboratory services. The staff consists of 12 full-time physicians, with graduate nurses on duty 24 hours per day. Generally, all types of surgery except brain and chest surgery are performed at the hospital.

The defendant's argument that the evidence did

not establish Fairview as a "legally constituted hospital" is completely without merit. Whether it is licensed or not is immaterial. Hospitals are required to be licensed by the State Board of Health because of the interest which the state has in the "health and safety of individuals to be cared for therein." ORS 441.022. The fact that Fairview was created by an act of the Oregon legislature and is operated under the supervision of the State Mental Health Division should satisfy this requirement.

A number of courts have liberally construed the term "hospital" as it appears in medical expense insurance policies.

In *Travelers Ins. Co. v. Esposito*, 171 So 2d 177 (Fla App 1965), the group medical policy insured the employee and his dependents. Travelers contended a private psychiatric treatment center was not a hospital. The definition of a hospital was for all practical purposes identical to the definition in the instant case, and the policy was issued by Travelers, the defendant herein. The center provided medical, physical and psychological care, nursing care on a 24-hour basis, and it was affiliated with another hospital for use of diagnostic and surgical facilities. The court found the psychiatric treatment center qualified as a hospital under the policy.

The decision in *Esposito* was followed by the Florida Court of Appeals in *Mutual Life Ins. Co. v. Young*, 211 So 2d 599 (Fla App 1968).

For a contrary holding, *see Burk v. Prudential Ins. Co.*, 7 NC App 209, 172 SE 2d 67 (1970), where the court held that the same psychiatric school and center with trained teachers did not qualify as a hospital because it had no diagnostic and surgical facilities as required by the policy.

In *Reserve Life Insurance Company v. Marr*, 254 F2d 289 (9th Cir 1958), cert den 358 US 839, 79 S Ct 63, 3 L Ed 3d 74 (1958), the policy required the hospital to have operating facilities on the premises. The court held a nursing home licensed as a psychiatric hospital qualified as a hospital under the policy. Although the home did not have operating facilities on the premises, it did have an affiliation with another hospital for use of their operating facilities.

Several courts have held various types of institutions for the infirm qualify as hospitals. In *National Bankers Life Ins. Co. v. Hornbeak*, 266 SW2d 228 (Tex Civ App 1954), the court held a type of convalescent home which provided its patients "room and board and general nursing care, hospital beds with side rails, a registered nurse on duty, * * * and equipment to give blood transfusions" was a "recognized hospital within the terms of the policy." In *Connors v. Mut. Benefit Health & Accident Ass'n.*, 49 Misc 2d 776, 268 NYS2d 154 (1966), the court held a home for the aged which possessed the required physical facilities qualified as a hospital under the terms of the policy. The policy defined a hospital as a place other than a convalescent, nursing, or rest home having accommodations for resident bed patients, a laboratory, a registered nurse on duty, and an operating room where surgical operations are performed by a legally qualified physician.

The court in *Employers Casualty Co. v. Givens*, 190 SW2d 155 (Tex Civ App 1945), held a 4-room nursing home conducted by a single nurse and having no operating facilities was not a hospital within the terms of the policy.

In *Prudential Ins. Co. v. Cline*, 51 Tenn App

636, 371 SW2d 158 (1963), the policy required the hospital to have a staff of physicians and 24-hour-a-day nursing care. The court held an institution which treated and cared for mentally and emotionally disturbed children was not a hospital because it did not provide 24-hour nursing care or have a staff of physicians. A contrary result was reached where the psychiatric treatment center had a full staff of doctors and registered nurses on duty 24 hours a day in *Meyers v. Aetna Life Ins. Co.*, 207 Pa Super 526, 218 A2d 851 (1966).

The plaintiff cites *Red v. Group Medical and Surgical Service*, 298 SW2d 623 (Tex Civ App 1947), which involved a boy who had become deaf due to an attack of spinal meningitis. The insured sought recovery for his son's tuition fees in a school which taught lip reading. The court found the expenses sued for were not incurred "in the treatment and care" of plaintiff's son as a "patient." The case is hardly applicable to the case at bar because the institution employed only lay instructors and had no medical staff.

The total complex of Fairview as an entity is obviously not a "hospital" under the terms of the policy. However, we conclude that the hospital at Fairview qualifies as a hospital because it provides diagnostic and therapeutic facilities for surgical and medical diagnosis, has 24-hour-a-day nursing service, is under the supervision of a staff of physicians, and meets all the qualifications of a hospital as defined in the policy.

■ The next issue is whether the medical expenses were incurred for "treatment of injury or sickness" of Daniel. It is conceivable that an individual could be a patient at Fairview and still not be entitled to recover payment for hospital or medical expenses, be-

cause his physical condition would not require medical or hospital treatment. Such is not the instant case. Dr. Callicrate, the medical administrator of the hospital, described Daniel and his condition as follows:

"Well, he is twenty-four years old, young man who is suffering from what is called moderate to severe mental retardation, which is complicated by diabetes mellitus, a type of diabetes which is rather difficult to control. In other words, he is one who must have regular, close observation because of his mentality to see to it that he does not do something that would jeopardize his health in the way of becoming injured or in the way of taking excessive amounts of food beyond his dietary requirements, and also being checked periodically for the amount of sugar in his urine so that we can calculate how much insulin he requires every day, and also to help correct some of his behavior, bad behavior habits that he exhibited while at the institution, and I believe this was mentioned earlier, that he defecated in his bed at night, and seemed to be out of control along this line, and they had to institute measures to try to correct this.

"Also, we have had to give him anticonvulsive medication. This medicine is given for epileptic seizures. In other words, he has a history of epileptic seizures even though he has not shown any seizures while in the institution."

In response to a question why Daniel was admitted to Fairview, Dr. Callicrate testified:

"It is my opinion he was admitted because he was mentally retarded, and had complicating physical problems of diabetes and possibly epilepsy, and complicating emotional problems exhibited in bizarre behavior."

Daniel's type of diabetes and his mental condition require strict supervision and control. He is re-

quired to go to the hospital twice each day for insulin injections and twice each day for urinalysis tests. He also receives anticonvulsive medication because of a history of epileptic seizures. Dr. Callicrate testified a person suffering from diabetes mellitus could become unconscious, fall and injure himself. On at least one occasion Daniel was admitted to the hospital suffering from multiple bruises and lacerations as a result of a fall. On another occasion he was admitted for a reaction suffered from eating toothpaste. For six months it was necessary to restrain his arms in a strait jacket at night, and Dr. Callicrate testified it may be necessary to do so again in the future.

It is true that Daniel lives in a cottage, participates in some recreational activities and helps to take care of bed patients. However, the policy does not require a patient to be kept in bed 24 hours per day. Modern environmental therapy calls for keeping mentally disabled persons out of bed as much as possible. See *Meyers v. Aetna Life Insurance Co.*, supra, at 854.

In *Raulston v. Mutual Ben. Health & Accident Ass'n.*, 22 Tenn App 101, 118 SW2d 881 (1938), the court held that if the assured is physically disabled by disease within the meaning of the policy and not able to follow a gainful occupation, the fact that the disease caused the assured to become mentally infirm does not preclude recovery under a policy which excluded loss sustained while suffering from insanity or mental infirmity.

Daniel's deteriorated mental condition was directly caused by his brain damage from the diabetic coma. He is in Fairview not solely because of his mental retardation, but because of the combination of

mental retardation and diabetes mellitus which is difficult to control. His mental condition and other behavorial problems make it extremely difficult, if not impossible, to care for him at home. The fact that Daniel is receiving treatment for his mental condition in addition to his physical condition cannot justify a denial of recovery under the policy. The treatment of both conditions is necessary to sustain his health and life.

Because of the combination of Daniel's physical condition and mental retardation, we conclude that Daniel was receiving "medical services * * * for treatment of injury or sickness" under the terms of the policy.

The policy in the instant case, after defining a hospital, specifically excluded places for rest, for the aged, for drug addicts, for alcoholics; nursing homes, hotels or the like.

We believe that the following statement of the court in *Connors v. Mutual Benefit Health & Accident Ass'n.*, 49 Misc 2d 776, 268 NYS2d 154 (1966), *aff'd* 27 App Div 2d 704, 279 NYS2d 1020 (1967), is particularly appropriate to the instant case:

> "If the insurer specifically wished to exclude a home for the aged regardless of what facilities such a home may contain, it could have easily so stated. If the company wished to exclude all institutions except those which provided each and every hospital facility and service, then the insurer could have easily so stated in its policy. [Citing cases]"

If the defendant herein wished to exclude insanity or mental retardation resulting from a physical trauma or disease, or to exclude anyone institutionalized in a state hospital for the mentally retarded or

insane from coverage under its policy, it could easily have so provided.

■ As the facts concerning whether the hospital at Fairview qualified under the defendant's policy and whether Daniel was receiving medical services for treatment of injury or sickness under the policy were undisputed, and there is no conflict in the testimony, the trial court should have decided the issues as a question of law and not submitted the case to the jury. *Denley v. Mutual of Omaha*, 251 Or 333, 445 P2d 505 (1968); *Young v. Crown Zellerbach*, 244 Or 251, 417 P2d 394 (1966).

We conclude that the plaintiff's motion for a directed verdict should have been allowed. Because of this conclusion, it is not necessary to consider the defendant's second assignment of error that certain evidence offered by the plaintiff should not have been received.

The judgment is affirmed.

## ON PETITION FOR REHEARING

For the petition Tooze, Powers, Kerr, Tooze & Peterson and Edwin J. Peterson, Portland.

No appearance contra.

HOWELL, J.

The defendant has filed a petition for rehearing, and contends that we held "at a matter of law that Fairview in toto was an institution *primarily* engaged in providing on an inpatient basis, facilities for the treatment and care of injured and sick persons."

■ We do not believe that it is necessary that the entire 640 acres of land and the dozens of buildings at Fairview be considered "a hospital" under the terms of the policy in order for plaintiff to recover. In addition to the other facilities, the complex at Fairview includes a hospital which, as we have mentioned, has a surgery room, emergency room, x-ray and laboratory facilities, and a staff of 12 fulltime physicians and graduate nurses on duty 24 hours per day. The hospital at Fairview is an "institution" which provides diagnostic and therapeutic facilities under a staff of physicians and nurses as required by the policy.

The defendant also contends that Daniel's residence care is not incidental to his need for hospitalization and that it should not be obligated to pay for any expenses other than those incurred for treatment at the hospital.

■ Daniel's mental retardation was the direct result of the diabetic coma or the insulin reaction. It was impossible to take care of him at home because of his mental condition and behavioral problems, all resulting from the brain damage caused by the diabetic coma. On one occasion he attacked his mother and destroyed the household furniture. Moreover, his mental condition prevents him from administering the insulin injection to himself.

When Dammasch State Hospital was considering a transfer of Daniel to Fairview, the chief psychologist stated, "It would probably be well to make the basis of such a transfer the *actual brain damage rather than his intellectual level* * * *." (Emphasis supplied.)

Shortly after he was admitted to Fairview, his behavior was described as "very bizarre, he is ob-

viously psychotic, completely out of contact with reality" as a result of his brain damage.

Later Daniel improved, but he still receives "daily behavior observation." On one occasion in 1969 he escaped from his room and had to be forcibly returned. His parents testified that when they visited him "he recognized us, but he can't put anything together any more. * * * He imagines things and we have to watch him constantly."

If Daniel did not have his physical and behavioral problems, he might very well be one of the many thousands of mentally retarded people in this state who are not institutionalized at Fairview. In this regard Dr. Callicrate, the medical administrator at Fairview, testified:

"Q. Fairview home is operated by the State of Oregon, is it not?

"A. Yes.

"Q. And you are employed by the State of Oregon?

"A. Yes, sir.

"Q. And the reason that home exists is that there will be someplace where people with some mental defects can be taken care of; is that not correct?

"A. I think there is more to it than that. In other words, not just any mentally retarded person can be brought in unless they are in need of a certain kind of care.

"Q. What type of care must they need before they can be brought there?

"A. They have to have other problems, you might say, other than just being mentally retarded. If you look at the population of the State of Ore-

gon, counting the mentally retarded you would be counting up to about sixty thousand people. Our facilities care for about twenty-two hundred, which is a small portion of the population of Oregon. In other words, of the population of retarded people that we get, usually have some other complicating things, not attendant to the mental retardation; in other words, involves things that might be mental in combination with a physical condition plus retardation, and that is the reason our facilities have to exist."

■ We believe that the evidence supports the conclusion that Daniel's residence care is incidental to his need for hospitalization.

The defendant also contends that the evidence presented a question of fact and not of law and that this court should not have decided that plaintiff was entitled to a directed verdict. In its briefs and in the oral argument before this court, counsel for defendant has contended that the evidence presented a legal, not a factual, question in the defendant's favor. We believe that the undisputed facts entitled the plaintiff to a directed verdict.

The petition for a rehearing is denied.